You may proceed. Good morning. May it please the Court. My name is Lori Cook, and I represent the appellant, Electric Power Systems International, known as EPS in this case. This appeal centers on the interpretation of two exclusions in a Zurich policy that was issued to EPS. Zurich denied coverage for a property damage claim based on two exclusions in the policy. The first exclusion is the particular part of your work, and the second exclusion is the care, custody, or control exclusion. With respect to the first exclusion, the one relied upon by the district court in granting summary judgment for Zurich, the primary dispute is whether EPS was performing its work on the particular part of a transformer that was damaged. Contrary to Zurich's argument, our position is that removing an external bushing from a transformer did not require EPS to perform work on the critical internal component known as a coil. By way of brief background, the transformer is a large piece of electrical machinery with numerous parts, component parts, including the bushings, which are externally extended about 9 feet above the large transformer. This piece of equipment weighs about 403,000 pounds, so it's obviously a large piece of equipment. But there are a lot of distinct and separate components that comprise the transformer, including the bushings, radiators, fans, wiring gauges, lead cables, and the internal core and coil. Counsel, when I look at the special instructions, there are references to things you do to the coil, something about grounding the coil. I don't understand any of it. Are you sure that working on the coil is not included in these seven pages? Your Honor, the scope of work that EPS was required to do was simply to remove the external components, and that's what they were doing at the time. Well, it mentions checking grounding on the core, core ground if accessible. I don't think that requires any work on the coil itself. Well, it mentions it. What do you think? It's part of the transformer itself, but our scope of work was simply to remove the external components. And the ultimate ruling on this case by the district court was that the EPS was performing work on the coil's lead cable. So I think the judge, in response to Zurich's argument that we were basically working on the entire transformer, she narrowed it somewhat but found that we were working on the coil's lead cable. Well, that's a mischaracterization. The lead cable is an entirely separate part from the coil. They're all connected. I mean, the nature of electricity is that the parts of the transformer are connected, but the part that we were working on was removing the bushing from a plate, a bushing plate or flange, it's known as. And that plate is connected to the lead cable, and the lead cable is ultimately connected to the coil. We're in appellate court. How do we know what this scope of work really means? What in the record tells us what it really means? Summary judgment. Who told us what it really means? Well, there was testimony that EPS did not have to touch the coil, did not have to work on the coil. That's in the summary judgment record. There's testimony by various employees. Now, Zurich cited testimony of one witness who said that the lead cable and the coil are the same part, which we disagree with, and there's testimony to dispute that. But even if you found that the lead cable and the coil are connected, we had not performed any work on that part of the transformer. What about when the crane pulled the bushing, the lead cable, and the coil away from the transformer? Were you performing work on all of those things when your crane did that? I would say we were performing our work on the bushing. The bushing was ultimate, and the plate that had the bolts connected to it. We had removed some bolts from the plate, but we did not work on the lead cable or the coil. That damage was incidental to our scope of work. Those three are connected, right? So the bushing and the plate is connected to the cable, which is connected to the coil. That is correct. They are interconnected parts. Does that matter to the analysis? I think what the district court did was equate interconnectedness with it being that particular part. I just want to point out the scope of this exclusion. Zurich had a Your Work exclusion, which did not apply here. They originally raised it as one of the bases for denial, but they withdrew their reliance on the Your Work exclusion. This is the particular part of Your Work exclusion. Based on the Missouri cases that we cite, the Columbia v. Shelf case, the court in that case, the statement from that case, and it's the Missouri Supreme Court, by using the words particular part, the provision evidences the intent to narrow the scope of the exclusion as much as possible. In other words, the subject of the insured's work is defined with great specificity. And we cite other cases where this is a narrow exclusion. Zurich chose this policy language. They chose to refer to the particular part. I mean, the definition of particular is one unit or element of many. So it's contemplated that the scope of this particular exclusion is narrow and only applies to the particular part of the work that the insured was performing its scope of work on. Well, if the work had been done well, the coil wouldn't have been messed with at all, right? If all of the bolts had been removed, that's correct. Right, right. If it were done correctly, all would be. But this phrase says the part where the work was incorrectly performed on it. And this is a classic case where the work was incorrectly performed. The work was incorrectly performed, but the particular part that was damaged was not the scope of our work, not within the scope of our work. It wasn't in the scope of what you intended to do, I guess. That's one point we know, right? That's correct. But what if you end up working on something that you weren't supposed to work on? I would still dispute that we were working on the components that were damaged. Our scope of work was to remove external components. It's the interconnectedness of this particular machine and the nature of electricity that the parts are interconnected. The case of the wiring of an airplane is one of the cases that we cite. In that case, the court found that even though the scope of the insurance work was to work on the wiring of the airplane and the insurance company sought to exclude damage that was caused by a fire to other parts, and the argument was that, well, all these parts are interconnected, but you were working on one particular part of the airplane. Is that a Missouri case, counsel, you're referring to? That is not a Missouri case. I didn't think it was for the four or five Missouri cases on this. Well, you have the cabinet case. That's a Missouri case. That's the Schauff case. Yeah. And, Your Honor, that is the primary case, and I think that the language from that case is clear. There's a lot of it. Yes. But the narrowness of the exclusion. I was on the court. That's not criticizing somebody else. There's a lot of it. Yes. Go ahead. It's a very well-reasoned opinion. Yeah. Extremely well-reasoned. No, no, what I was trying to get you to focus on, in Schauff, they said it didn't, burning down the house, you couldn't get damages for it, right? Right. Well, the insurance company wanted to exclude, they wanted to exclude the claim based on that particular part of exclusion. It was the particular part of real property, but the rationale is the same. Zurich argues that, based on our reasoning, you would only find that the paint nozzle was the only particular part that the insurer was working on. That would be the only part that was excluded. But, I mean, I disagree with that analysis. I think, under our analysis, we know what the particular part is based on the scope of work. Well, what is it? I thought you were switching between the bolt and the bushing, and what is the particular part under your position? I think that's a mischaracterization of our argument. And I addressed that in the reply brief. I'm not arguing that it's solely the bolt or solely the plate or solely the bushing. But it was a combination of those things that we were performing our work on. That was the scope of our work. Well, if you look again, and, of course, I'm no expert, but if you look at page one of the instructions, it sounds like you're supposed to do the whole thing. Disassemble, transport, reassemble, and test this whole big auto transformer. And, Your Honor, that was addressed in the deposition testimony and part of the summary judgment. The disassemble and reassemble, the EPS representative testified that disassemble was not really accurate. We were to remove the external parts. And all of the testimony really was that we were to remove the external parts. We were to ship only the external parts. We were not shipping the transformer. That was the buyer's responsibility was to ship the transformer. We were removing the external parts and shipping them. You were just going to leave the core there where it was sitting? Well, the core and coil is inside this. It's about a 10-by-12-foot structure. That was to be placed on a rail car and shipped to the purchaser's place of business. That was the purpose of removing these external bushings. They extended nine feet above the transformer, and you can't ship it by rail with these external components on it. The purchaser actually had hired a different company to perform the internal inspection on this transformer. So that's another basis for us to take the position that we were not working on that coil. You've got to test the coil. Testing the core is in here several times. And I believe that was on previous days where they did some testing. When I talk about days, I'm talking about the job. You all agree this is the job, this purchase order and contract? Yes, Your Honor. Core ground and checking the core ground is in here several times. Plaintiff's Exhibit 7, deposition Exhibit 2. I don't know. Did any of those help us at all? Well, Your Honor, I would still take the position that at the time this incident occurred, and that's the time that you look at in applying this exclusion, the time the incident occurred, we were performing the scope of work of removing the bushings. We were not working on the coil at the time that the incident occurred. And I'll just briefly address the care, custody, or control exclusion, because that is the other basis upon which Zurich moved for summary judgment. It was not the basis of the district court's finding, but I would submit that the care, custody, or control exclusion is absolutely not applicable here. This transformer was on a third party's site up in Wisconsin. It was surrounded by two locked gates and a perimeter fence. We had no access to this site other than someone from the seller letting us in. We had no possessory control, no exclusive possessory control, as referred to in the cases. It was not a bailment situation, and Zurich argued that we had utter autonomy and discretion over the transformer. Our position is we were solely hired and there to perform our scope of work. But we don't have fact-finding on this one, do we? The district court's decision does not address it, but Zurich has raised it as another ground for why the court could uphold the summary judgment in favor of Zurich, so that's why I addressed it in my brief. I'll reserve the rest of my time unless there are other questions.  Thank you, Your Honor. Mr. Fields, we'll hear from you. Good morning, Your Honors. Larry Fields on behalf of Zurich American Insurance Company. May it please the court. This case involves the purchase of a transformer by LGE from a company called ATC. The purchase of this transformer is the transaction in question that we're talking about. It was a multi-part transaction. Before LGE took ownership of it, they wanted it tested. And then after they took ownership of it, they would need to have it moved from ATC's property to LGE's property. And LGE hired EPS to do the majority of this transaction for them. As Judge Benton pointed out, in the transcript there is a seven-page contract, six numbered, one additional, with three pages of single-spaced, single-typed details of all the things that they were wanting. It barely mentions the core, though. If you look, the core is only testing the ground on the core, which I think is an electrical test. It may not even involve touching the core. You may do it without messing with the core. If you do it correctly, that might be correct. Correct. And so let me ask you about the Schaaf case, because in the Schaaf case, the painter was hired to paint the whole house. Yes. Interior, exterior, and all parts of it. In the Schaaf case. And the Supreme Court of Missouri said it's only the kitchen cabinet area was the particular part being worked on, and you couldn't get damages for the whole house, right? That's the ruling. Oh, boy, doesn't that sound like, in this case. Here's what the Schaaf case did, Your Honor, is recognize the fact of what is called a business risk exclusion. And the business risk exclusion, the idea of it is that the insurance companies like Zurich, you don't get to buy a policy to guarantee your workmanship or that your faulty work won't damage the thing that you were hired to work on. And in this case, EPS was hired to work on this transformer, do lots of stuff to this transformer, inside and outside of the transformer. And it is their very faulty workmanship that caused the very damage to the very property that they were not supposed to damage, which is the transformer. The Schaaf case does two things important for this court to recognize. One is recognize that business risk exclusions are not ambiguous and can be enforced. And two, so quote in the Schaaf case, you cannot so narrowly apply the exclusion. First of all, let me point out that Schaaf dealt with exclusion J5, not J6. Yeah, but they're lying. Go ahead. And it said you cannot so narrowly apply it that only the moment the insured is intentionally touching the real property that's the object of his work would read the exclusion out of the policy. And that's exactly what EPS is trying to do in this case. They're trying to narrow it to a bolt or to a bushing or to a plate. Didn't the Supreme Court of Missouri do that in Schaaf, though? No, because in Schaaf, what Schaaf argued was it only applied to the cleaning gun. That's all I was working on at the time. And the court said, no, we have to at least look at all the things that you were performing an operation on as part of your work. What's more on point than Schaaf is your own rulings. No. Break landscaping. Be very careful here. You're in diversity jurisdiction. Break and Sparatus both acknowledged Schaaf, both find the rulings consistent with Schaaf. They specifically talk about Schaaf. Sparatus is a Missouri case, right? Missouri law applies? Yes. Yeah, go ahead. And so is break landscaping. Yeah, go ahead. And in both of those cases from the Eighth Circuit, Schaaf's discussed. And the Eighth Circuit finds the results in break and Sparatus in harmony with Missouri law. And there's been no Missouri court that's ever suggested that they are not. And in both of those cases, what this court makes clear is that EPS's argument about scope of work isn't how it works. In break landscaping, the insured tried to argue our scope of work was the weeds, not the grass. And that's correct. They were only supposed to work on the weeds, not the grass. But in reality, they worked on the grass. They applied something to the whole lawn. Right. But they were claiming their scope of work wasn't to affect the grass, just like EPS is claiming in this case. Our scope of work wasn't intended to pull the coil out of the transformer. Well, I get that. The scope of work is never intended to cause damage. But when it is your work that directly causes the damage of the thing that you're supposed to not break, that's when these exclusions apply. Well, except it says on it at the end. The particular part of the property that must be repaired because your work was performed on it. Right. That it is the key, right? Figuring out what the it is is the key. Well, honestly, a lot of these courts look at it in a more pragmatic point of view, which is did you injure the thing that you were supposed to be working on to protect? Yeah. But even if you want to go to the it, they worked on the coil. They pulled it out of the transformer. It didn't happen by magic. It happened by them attaching a crane to it and yanking it out. They didn't intend to work on it, but they did, in fact, work on it. They, in fact, pulled it out of the transformer. Well, what is the relevance of their intent? I don't think it has one, but that's what EPS is arguing. It was within our scope of work. What's your best case where the insured didn't intend to work on something? Break. The insured didn't intend to work on the grass. Sporadically. Wait a minute. It did intend to spray onto the grass. Well, the argument that break was trying to make was we did not intend to work on the grass. We intended to work on the weeds in the lawn. So it is a lawn that they tried to break. All right. I understand. Give me another example. Sporadus, where they tried to say that we didn't intend to work on the river. Of course, it was part of the job at all the time that that bridge was going to end up in the river. Yeah. Yeah. It was supposed to fall down in the river. Illinois, I don't know. I don't get it. But that was the problem, that they took the old bridge and dropped it in the river and put a new bridge above it. Right. I just work here. Right. But, no, that was always the intent, though, there. This wasn't ever the intent. Well, no, it wasn't the intent to do it the way they did it. The intent was to do it in such a way that it would only happen for two hours, that the river would only be around for two hours. That's true. What wasn't intended was for it to explode the way that it did, half of it fall in and not half of it fall in. And block the river for weeks. It's the fact that you didn't do it the way that you intended to do it that typically causes the damage. Usually, if it goes the way you intend, there is no damage. Well, these bushings were clearly separable from the main part of the transformer, right? Sure. That was the whole point of hiring this particular company to do that discrete bit of work. Well, that was part of what they were doing, for sure. They were disassembling the transformer for transport. That's exactly what it says in their contract. So there's nothing that says you're only working on the bushing, bushing number one or bushing number two or bushing number three. It says a bunch of stuff, actually. Go and remove all of the oil. So in this case, if while they were removing the oil, they accidentally lit the oil on fire instead and burnt up the transformer, would they then argue that we weren't supposed to be working on the inside of the transformer and, therefore, this isn't our work? Of course not. That would be their work. After the oil was removed, there was going to be some testing done by a third party, okay? So they remove the oil, they inspect, they remove all of the external components, whatever might be there. The contract's not even specific, and there was some testimony that one of the things the contract said wasn't even there. But whatever's there, remove it so we can transport it. You move all the external parts. We, LGE, will move the big part. Including the core, right? Including the core that's inside of it. And then when we get it there, put it all back together again. But inherent in all of this is remove it all, test it all, put it all back together without destroying it. I mean, if this case had gone to trial, LGE would have been suing EPS for breach of contract and failing to do their work in a workmanlike manner. That's what this case would have been. And that is what is supposed to be excluded by business risk exclusions of not doing your job right and damaging the thing that you're supposed to fix. If they had done this case- Did you say EPS was supposed to move it on the train? They were moving the external components. But somebody else was then going to move it on the train? Yes. So they weren't solely in possession of this thing the entire time. They were solely in control of it a couple of times, both during the disassembly process and during the reassembly process. In between those two events, they would be in control of part of it while another part was moved by rail. But what- I mean, the distinction here that you've got to look at, including in all the cases that they cite, is when you're hired to do one particular part to a huge thing. The grain mill case where they were hired to just fix the elevator, the grain elevator- It's not a Missouri case. It's not a Missouri case. All the rest of these are not Missouri. Missouri cases are all- Back to Missouri. Yes. After- Oh, I'm sorry. Give him one minute on the grain case. All right. So in the grain case, they're hired to repair a grain elevator, and they messed up while repairing the grain elevator and burnt down the whole grain mill. The court said the grain elevator that you were supposed to be fixing was excluded, but the whole grain mill is covered. If EPS would have caught this thing on fire, blown this transformer up, and it destroyed all of ATC's entire electrical system and their entire grid, I wouldn't be in here saying that all of those other damages aren't covered. That wasn't their scope of work. That wasn't their job. That wasn't the property that they were working on. That's other third-party property that was damaged by their work, not the thing that they were working upon and damaging. I do think Schauff is pretty much controlled when all is said and done. It is in the cases the Eighth Circuit's done, and it's Missouri Supreme Court speaking on it, and it is six or eight pages there in a row. But when you get to the bottom line of it, it says in the case of multiple reasonable interpretation, the more narrow interpretation applies. Provided that you don't read it so narrowly that you read the exclusion out of it, which is what we're talking about in this case. When you try to get it down to just the one bushing, really what EPS should be arguing is that the only thing that's excluded are the handles of the crane, because that's the only thing we were touching at the time. Well, no, that's like the nozzle. That's why they don't make that argument, because Schauff rejects that argument, the nozzle of the thing that blew up in Schauff. Go ahead. I think it's the same argument to say just the bushing or just the bolt or just the lead cable, or whichever one of those other component pieces they went after to just make it at whatever particular time they're arguing. That's not what the scope of work was. That's not what their contract called for, and that's not all that they were doing. They were hired to work on this transformer, and they destroyed this transformer because of what they did to it while working on it. And that puts us right back in brake landscaping, and that puts us right back in sporadics, both of which are based on Missouri law, both of which cite Schauff and rely on Schauff, and, again, both of which rely on J6, which is the exclusion that the court in this case relied on, and not J5, which is at issue in Schauff. I shouldn't ask you, but I'm going to. You don't think there's really a difference between a J5 analysis and a J6 analysis, do you? There is some. But not relevant. J5 is a process, and J6 is what you are working on. Correct. So J5 can theoretically somewhat get into the scope of work argument because of what your process is supposed to be. J6 is what it is you're working on. But clearly and for sure, all of the exclusions within the subcomponent of J are business risk exclusions with the particular purpose of making an insurer not the guarantor of the insured's work, which is what EPS wants in this case. They want Zurich to guarantee their faulty workmanship. It's precisely what they want. LGE had to go out and replace this transformer with a different transformer because they destroyed this transformer in the course of performing work on it. And because of that breach of contract and that faulty workmanship, they want Zurich to pay as a guarantor of their work. And that's not what the policy is supposed to do, and that's recognized by Schauff, as well as the Eighth Circuit case. That's all I have, Your Honors, unless you have other questions. No, thank you very much for your argument. Ms. Cook, we'll hear from you in Roboto. Just briefly, the EPS's scope of work definitely did not involve touching the coil at any time. But testing it, you agree. Correct. You had to test it but not touch it. Not touch it. Okay. What Zurich is really trying to do here is to read out the particular part language. And the district court started out its opinion on page one by referring to the your work exclusion. And I think if it were a your work exclusion, then it would apply if it was just to your work. But this is the particular part exclusion which, as Your Honor has recognized, the Schauff case does address and is dispositive, we believe, on this point. Both the Brake case and the Spiritus Reckon case are addressed in the briefs. We distinguish them. And in fact, in Spiritus, the scope of work was to work on the river. And that's in the court's opinion. It's part of the rationale for the opinion is that the scope of work involved both the bridge and the river below. So that case is distinguishable. The Brake case, the insurer was hired to spray the lawn. So the lawn was the particular part worked on. They weren't hired to just spray the weeds or the grass. They were hired to spray the lawn. So I think both of those cases are distinguishable. And for those reasons, we believe that the particular part exclusion does not apply. And summary judgment was incorrectly granted. All right. Thank you for your argument. Thank you, Your Honor. The case is submitted, and the court will file an opinion in due course. The court will be in brief recess for five or ten minutes, and then we'll hear argument in the three remaining cases.